## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DAVID BOSSERMAN,                  :
                                  :
                 Plaintiff        :        No. 3:16-CV-0091
                                  :
        vs.                       :        (Judge Nealon)
                                  :
NANCY A. BERRYHILL,[1] Acting     :
Commissioner of Social Security,  :
                                  :
                 Defendant        :

## <u>MEMORANDUM</u>

On January 17, 2016, Plaintiff, David Bosserman, filed this instant appeal[2]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying his application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for former Acting Commissioner, Carolyn W. Colvin, as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

§ 1461, et seq. and his application for Supplemental Security Income ("SSI")[3] under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] his applications for DIB and SSI on September 11, 2013, alleging disability beginning on the amended onset date of June 8, 2013, due to a combination of "degenerative disc disease, bulging disc, apnea, insomnia, anxiety, depression, and adjustment disorder." (Tr. 13, 269).[5] These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on November 21, 2013. (Tr. 13). On December 12, 2013, Plaintiff filed a request for an oral

---

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 5, 2016. (Doc. 9).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

hearing. (Tr. 13). On August 12, 2015, an oral hearing was held before administrative law Patrick S. Cutter ("ALJ"), at which Plaintiff and impartial vocational expert Sheryl Bustin testified. (Tr. 13). On August 19, 2015, the ALJ issued an unfavorable decision, finding Plaintiff not disabled and effectively denying his applications for DIB and SSI. (Tr. 13-26). On September 8, 2015, Plaintiff filed a request for review with the Appeals Council. (Tr. 9). On November 18, 2015, the Appeals Council denied Plaintiff's appeal, thus making the decision of the ALJ final. (Tr. 1-5).

Plaintiff filed the instant complaint on January 17, 2016. (Doc. 1). On April 5, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed a brief in support of his complaint on May 19, 2016. (Doc. 11). Defendant filed a brief in opposition on June 23, 2016. (Doc. 13). Plaintiff filed a reply brief on June 29, 2016. (Tr. 14).

Plaintiff was born in the United States on August 25, 1968, and at all times relevant to this matter was considered a "younger individual."[7] (Tr. 254). Plaintiff

---

7. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

graduated from high school in 1987, and can communicate in English. (Tr. 268, 270). His employment records indicate that he previously worked as a cook. (Tr. 257).

In a document entitled "Function Report - Adult" filed with the SSA on November 2, 2013, Plaintiff indicated that he lived in a homeless shelter alone. (Tr. 294). He had no problems with personal care tasks, but did indicate that he "did not care about [him]self enough" to bathe. (Tr. 295). He prepared "simple dishes" daily for thirty (30) minutes, but could "no longer cook full meals." (Tr. 296). He did the laundry for fifteen (15) minutes. (Tr. 296). He shopped in stores weekly for thirty (30) minutes for food and movies. (Tr. 297). He could walk three (3) blocks before needing to rest for fifteen (15) minutes. (Tr. 299). When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check reaching, sitting, talking, hearing, seeing, memory, understanding, following instructions, using hands or getting along with others. (Tr. 299).

Regarding concentration and memory, Plaintiff needed a special reminder to take a shower, but did not need reminders to go places or to take medicine. (Tr. 296, 298). He could pay bills, use a checkbook, count change, and handle a savings account. (Tr. 297). He was not able to finish what he started, followed written instructions "very well" and spoken instructions "good," and did not

4

handle stress or changes in routine well. (Tr. 299-300).

Socially, Plaintiff went outside daily unaccompanied, used public transportation, and indicated that he was able to drive. (Tr. 297). His hobbies included, "computers, jewelry, [and] cooking," and he noted that he did these things "very well and [three times] a week," but that he was "not able to motivate" himself to do these activities. (Tr. 298). He spent time with others and went to church, both on a weekly basis. (Tr. 298). He did not have problems getting along with others. (Tr. 299).

At his oral hearing on August 12, 2015, Plaintiff testified that he was living in a homeless residence. (Tr. 30). Regarding his medical conditions, he indicated that the venous insufficiency condition caused both of his legs to swell and blister, and that a vein ablation performed almost a year earlier did not reduce the swelling. (Tr. 31). He testified that his anxiety caused him to feel he "fidgety," was triggered by stress and large groups, and was helped with therapy and medications, including Buspirone and Celexa. (Tr. 32-33). Regarding his back and neck impairments, he stated that he had "really strong constant pain in the lower back" that radiated toward the lower part of his abdomen and the belt area that felt like he was "having a railroad spike shoved in and it causes numbness across the lower abdomen." (Tr. 35). Regarding his asthma, he stated that he

5

became short of breath every few days and that aggravating factors included humidity, being near a fryer, and sanitizer used for washing dishes. (Tr. 37).

In terms of abilities, Plaintiff indicated he was able to sometimes stand for a couple of hours if standing still, was able to walk about twenty (20) minutes before needing to "take a break for a couple of minutes" before resuming walking, and was able to lift thirty (30) pound items at work. (Tr. 33-34). He worked as a fry cook part-time, and stated that he could not do this job on a full time basis due to pain in his back and legs and his asthma. (Tr. 30, 35). He testified that he would not be able to perform a job in a seated position because he would get restless and fall asleep and because sitting for a long time caused his legs to hurt. (Tr. 36).

## MEDICAL RECORDS

### A. Medical Evidence

#### 1. Mental Health Impairments

##### a. Pressley Ridge

Plaintiff had pharmacotherapy appointments at Pressley Ridge on July 3, 2013, October 23, 2013, January 29, 2014, February 5, 2014, March 10, 2014, April 21, 2014, April 23, 2014, April 28, 2014, July 14, 2014, September 22, 2014, and October 20, 2014. (Tr. 449, 653, 658-662, 693-698). It was noted that

Plaintiff's diagnoses include Depressive Disorder and Anxiety Disorder, that his medications included Citalopram and Buspar, and that his strengths were "sense of humor, cooking, fixing things, very caring person." (Tr. 449, 653-658, 693-696). Examinations revealed: a groomed appearance; cooperative behavior; a euthymic mood; normal speech; goal-directed and logical thought processes; good attention and concentration; and fair judgment. (Tr. 659-662, 697-698).

On August 7, 2013, Plaintiff had an appointment at Pressley Ridge. (Tr. 451). He completed a "Sheehan Adult Scale," on which he indicated that his anxiety symptoms moderately disrupted work; mildly disrupted family life and home responsibilities; and had reduced his productivity two (2) days in the last week due to his symptoms. (Tr. 451).

### b. **Harrisburg Hospital**

On October 21, 2013, Plaintiff presented to the emergency room at Harrisburg Hospital for depression and anxiety after being told four (4) days prior that he could no longer live at Safe Haven. (Tr. 586, 588). A psychiatric examination was normal. (Tr. 587). Plaintiff was discharged as stable and was instructed to continue taking his medications, and arrangements were made for him to live at "Windows CDA." (Tr. 587-588).

### c.     Team Care Behavioral Health

On December 2, 2014, December 8, 2014, December 15, 2014, December 22, 2014, January 5, 2015, January 16, 2015, January 26, 2015, February 2, 2015, February 10, 2015, February 23, 2015, March 16, 2015, March 23, 2015, March 30, 2015, June 30, 2015, July 7, 2015, July 9, 2015, July 14, 2015, and July 28, 2015, Plaintiff had therapy appointments at Team Care Behavioral Health. (Tr. 818-823, 922-925, 953-955, 976-982). Plaintiff's mood ranged from depressed to anxious to euthymic, his affect was full, and his behavior ranged from cooperative to agitated to a loss of interest. (Tr. 818-823, 922-925, 953-955, 976-982). It was noted he felt uncomfortable and slightly panicked with the thought of a crowd and that there appeared to be a fear of being out of control. (Tr. 818-823, 922-925, 953-955, 976-982). A psychiatric specialty examination performed on July 9, 2015 revealed: a well groomed appearance; normal speech; a logical thought process; fair judgment; intact recent memory; fair attention and concentration; a euthymic mood; a congruent affect; and an intact fund of knowledge. (Tr. 979).

### 2.     Back and Neck Impairments

### a.     Orthopedic Spine Institute of Pennsylvania

On August 13, 2013, Plaintiff had an appointment with Danielle Miller-Griffie, PA-C, for neck pain. Plaintiff reported his symptoms of neck pain with

left hand numbness and tingling in the glove distribution had increased since the last appointment, and that he also had decreased sensation over "the arm itself." (Tr. 464). A physical examination revealed Plaintiff: was pleasant, cooperative, awake, alert, and with a normal attitude; had a decent range of motion in his neck that was painful; had no tenderness over the spinous processes; had neurovascularly intact upper extremities, but with decreased sensation over the left arm and hand; and had equal and symmetrical "DTRs" over the upper and lower extremities. (Tr. 464). His diagnoses included cervicalgia and left hand numbness. (Tr. 464). A nerve conduction study was ordered to rule out cervical radiculopathy versus peripheral neuropathy. (Tr. 464).

On September 30, 2013, Plaintiff had an appointment with Robert Dahmus, M.D., for "trouble with both arms, right much worse than left." (Tr. 462). He described his pain as starting in his neck and radiating down his arm into his hand, and reported that he had numbness from his neck into his hands, with none of these symptoms being aggravated by shoulder movement, but rather with certain positions of the neck. (Tr. 462). A physical examination revealed he: was alert and oriented with a pleasant, but somewhat depressed, affect; had excellent motion of his shoulder without pain; had excellent strength to resistive exercise with his rotator cuff; had good grip and pinch strength; and had no atrophy in either arm or

hand. (Tr. 462). Dr. Dahmus referred Plaintiff to others in his office for treatment of the neck pain. (Tr. 463).

On October 4, 2013, Plaintiff had an appointment with Danielle Miller-Griffie, PA-C, for neck pain. (Tr. 460). Plaintiff noted he had increased pain that was causing numbness and tingling in his right arm and had decreased sensation involving the left side of his body. (Tr. 460). The medications he took included Tramadol and Naproxen. (Tr. 460). His physical examination revealed he: was awake, alert, pleasant, cooperative, and with a normal attitude; had decent range of motion in his neck; had neurovascularly intact upper extremities; and had equal and symmetrical sensory, motor, and reflex examinations of the upper extremities. (Tr. 460). Plaintiff was assessed as having bilateral upper extremity pain and Cervicalgia, he was instructed to reschedule an EMG, and he was prescribed Neurontin. (Tr. 460).

### b. **Harrisburg Hospital**

On September 5, 2013, Plaintiff presented to the emergency room at Harrisburg Hospital for right shoulder and neck pain that was worse with movement. (Tr. 610). A physical examination revealed: a normal upper extremity exam; normal speech; orientation to person, place, and time; a normal respiratory exam; and a normal affect. (Tr. 611). Plaintiff was discharged with the instruction

to follow up with a primary care physician in one (1) to two (2) days. (Tr. 612).

On February 3, 2014, Plaintiff presented to the emergency room at Harrisburg Hospital due to right-sided neck pain that radiated down his right arm, which he reported felt like it was tingling. (Tr. 553). The medications he was taking at the time of this visit included Lasix, Compazine, Celexa, Neurontin, Pravastatin, Loratadine, Protonix, Tramadol, Naproxen, Klorcon, Amlodipine, Metoprolol, Tylenol, Aspirin, and BuSpar. (Tr. 554). A physical examination revealed: a normal range of motion in the neck with a paraspinal muscle spasms in the right cervical region; no wheezing, rales, or rhonchi; normal range of motion in the back without tenderness; normal range of motion in the upper and lower bilateral extremities; normal speech; normal memory; and no focal sensory, motor, or cerebral deficits. (Tr. 554-555). At discharge on the same day, it was noted that the pain seemed to be musculoskeletal in nature and that Plaintiff was feeling slightly better with pain "likely related to underlying bulging discs, stenosis." (Tr. 555). Plaintiff was prescribed Norco and Valium and was discharged in stable condition. (Tr. 555).

On December 12, 2014, Plaintiff presented to the emergency room for upper back and neck pain after a motor vehicle accident. (Tr. 810). A physical examination revealed Plaintiff's back, extremities, gait, speech, skin, neck, eyes,

and head were normal.  (Tr. 811).  X-rays showed: mild disc space narrowing at the C5-C6 level with marginal endplate osteophytes; well-maintained disc spaces and verteral body heights; normal alignment of the cervical spine; and no acute osseous abnormality in the cervical spine.  (Tr. 816).  Plaintiff was discharged on the same day.  (Tr. 812).

### c.  Kline Health

On August 8, 2013 and September 10, 2013, Plaintiff had appointments for back pain.  (Tr. 798).  While the notes from these visits are largely illegible, it was noted that Plaintiff was obese and was able to perform spinal flexion and extension without discomfort.  (Tr. 797).  Plaintiff was instructed to start physical therapy.  (Tr. 797).

On August 13, 2014, Plaintiff presented to urgent care of Kline Health for neck pain that began three (3) weeks prior, with the pain located in the bilateral lateral neck that Plaintiff described as aching and that caused tingling sensations in the right arm intermittently.  (Tr. 798).  Aggravating factors were rotation and "turning head," and Plaintiff reported she did not experience relief from Tylenol, NSAIDs, or Tramadol.  (Tr. 798).  It was noted that an MRI from April 2013 showed disc bulges at C3-C4 and C6-C7 with mild central spinal canal narrowing at C3-C4 and varying degrees of neural foraminal narrowing.  (Tr. 798).  A

physical examination revealed: active painful range of motion in her cervical spine without atrophy; normal gait; normal and pain-free range of motion in the left bilateral shoulders; normal bilateral upper extremity strength; orientation to time, place, person, and situation; and an appropriate mood and affect. (Tr. 799). Plaintiff was prescribed Percocet for the pain. (Tr. 800).

### d.     Pinnacle Health- Physical Therapy

From August 15, 2013, through September 10, 2013, Plaintiff attended physical therapy for lumbar degenerative disc disease. (Tr. 898-918). Plaintiff's self-reported symptoms included: a pain level of four (4) out of ten (10); an inability to sit for more than two (2) hours; and alternating difficulty with putting on socks. (Tr. 898-918). His therapy included therapeutic exercises and moist heat with the objective of lowering pain and restoring range of motion to normalize his gait. (Tr. 898-918).

### 3.     Knee/ Leg Impairments

### a.     Harrisburg Hospital

On December 9, 2013, Plaintiff presented to the emergency room at Harrisburg Hospital due to left knee pain. (Tr. 569). It was noted that Plaintiff had been to the emergency room several times over the last few weeks on October 7, 2013, November 7, 2013 and November 15, 2013 for this same knee pain, and

that x-rays were negative.  (Tr. 570-571, 575-578, 581-583, 592-594).  A physical examination revealed: normal lower extremity inspections with intact sensation, normal strength, normal pedal pulse, normal range of motion, decreased active flexion, tenderness to palpation to the medical aspect of the right knee, an ability to straight leg raise, and pain with all special testing of the knee; normal gait; normal speech; and a normal respiratory exam.  (Tr. 570, 593).  Plaintiff was given Morphine and was discharged.  (Tr. 570-571).  It was noted that Plaintiff was following up with Kline Orthopedics the following day.  (Tr. 571).

On August 30, 2014, Plaintiff presented to the emergency room due to contact dermatitis and peripheral edema of an uncertain cause.  (Tr. 716).  On examination, there was swelling, a rash, and drainage from the right leg.  (Tr. 716).  Plaintiff was diagnosed with cellulitis and discharged with antibiotics.  (Tr. 716).

On September 9, 2014, Plaintiff presented to the emergency room of Harrisburg Hospital for worsening redness of the bilateral lower extremities.  (Tr. 709).  He was diagnosed with cellulitis and was prescribed antibiotics.  (Tr. 709).

On January 5, 2015, Plaintiff underwent diagnostic imaging of his right knee, which showed no fracture, dislocation or significant knee effusion; normal joint spaces; normally mineralized bones; normal soft tissues; and fragmentation

14

of the tibial tubercle similar to a prior study and likely reflective of prior Osgood-Schlatter's Disease. (Tr. 824).

### b. Vascular Associates

On October 31, 2013, Plaintiff had an appointment with Stephen Greer, D.O., for complaints of pitting edema of his bilateral legs associated with achiness. (Tr. 672). A physical examination revealed Plaintiff: was obese; had lungs clear to auscultation without wheezing, rales, or rhonchi; and had stasis dermatitis along with a previous healed anterior tibial ulceration on the right side. (Tr. 673). Plaintiff was diagnosed with venous insufficiency, and venous duplex scanning was ordered to confirm the diagnosis. (Tr. 673).

On December 3, 2013, Plaintiff underwent a peripheral venous duplex. (Tr. 680). The impression was that there was: evidence of severe venous reflux at the sapheno-femoral junction levels bilaterally, in the bilateral common femoral veins, in the distal left superficial femoral vein, in the greater saphenous veins at the mid thigh and knee levels of the right and at the knee and proximal calf levels, and in an accessory saphenous vein on the right; and mild lymphedema in the calves bilaterally. (Tr. 681).

On December 5, 2013, Plaintiff had an appointment with Dr. Greer for severe venous insufficiency. (Tr. 670). It was noted that his ulcer had closed.

(Tr. 671). Plaintiff was prescribed compression stockings, and was scheduled for a follow-up in three (3) months. (Tr. 670).

On March 20, 2014, Plaintiff had an appointment with Dr. Greer for bilateral saphenous vein reflux associated with pain and edema. (Tr. 668). Plaintiff reported that his pain was fifty percent (50%) less with the use of the compression stockings for three (3) months, but that he was still "very uncomfortable." (Tr. 668). Dr. Greer noted Plaintiff was considering ablation therapy. (Tr. 668).

On April 8, 2014, Plaintiff had an appointment with John Calaitges, M.D., for continued edema and pain in his legs and a history of severe bilateral venous reflux disease with multiple venous ulcers in his legs. (Tr. 665). A physical examination revealed chronic edema and skin changes in his lower legs, non-labored breathing, no open wounds, and an appropriate affect. (Tr. 665). Dr. Calaitges explained that Plaintiff's chronic venous disease would improve with bilateral endovenous ablation, and Plaintiff was then scheduled for the procedure. (Tr. 666).

On June 23, 2014, Plaintiff underwent a bilateral duplex guided greater saphenous vein VNUS endovenous ablation performed by Dr. Calaitges for bilateral greater saphenous vein symptomatic reflux. (Tr. 738).

16

On June 26, 2014, Plaintiff underwent a peripheral venous duplex after a bilateral venous ablation. (Tr. 690). The impression was as follows: the right greater saphenous vein is totally obliterated from just beyond the sapheno-femoral junction to the proximal calf level following recent endovenous radiofrequency ablation; and the left greater saphenous vein is totally obliterated from just beyond the sapheno-femoral junction to the proximal calf level following recent endovenous radiofrequency ablation. (Tr. 690).

On July 15, 2014, Plaintiff had an appointment with Dr. Calaitges for a three (3) week follow-up after the bilateral vein ablation. Plaintiff reported that his legs felt great, and it was noted that the swelling was decreased and the discoloration looked better. (Tr. 664).

On September 7, 2014, Plaintiff underwent a lower extremity arterial ultrasound. (Tr. 706). The results were that Plaintiff had: arterial flow with mostly triphasic waveforms throughout the bilateral lower extremities; and velocities largely within normal limits with no focal elevations noted in the vessels visualized. (Tr. 706).

On June 9, 2015, Plaintiff had an appointment with Dr. Calaitges for a follow-up appointment after ablation surgery. (Tr. 983). His examination revealed he: was "quite obese"; had chronic swelling of his lower extremities with

chronic skin discoloration; and had a normal arterial exam. (Tr. 983). A venous

duplex showed the treated greater saphenous veins were both totally obliterated,

status post endovenous ablation, and there were no new findings noted other than

evidence of chronic dilated lymphatic channels in both of his legs. (Tr. 983).

### c.     Kline Family Practice

On December 10, 2013, January 14, 2014, March 13, 2014, August 12,

2014, and November 4, 2014, Plaintiff had appointments for left knee pain. (Tr.

791-795). At these visits, which contained largely illegible notes, Plaintiff

received "CSI" injections into the left knee and had immediate pain relief. (Tr.

791-795).

On February 28, 2014, Plaintiff presented to urgent care at Kline Health for

left knee pain after hearing a pop. (Tr. 801). It was noted an x-ray showed a small

effusion, and that an injection that had helped his knee pain had worn off over the

prior three (3) to four (4) weeks. (Tr. 801). Aggravating factors included moving

and bearing weight on the knee. (Tr. 801). A physical examination revealed:

normal bilateral alignment and skin; normal gait; mild diffuse right knee pain;

medial lower knee pain; mild crepitation in the right knee; active painful range of

motion with limiting factors of pain in the bilateral knees; normal bilateral lower

extremity strength; normal neurovascular lower extremities; orientation to time,

place, person, and situation; and an appropriate mood and affect. (Tr. 802). It was noted that an MRI done in December 2013 showed a non-displaced medial tibial fracture. (Tr. 802). Plaintiff was diagnosed with left knee pain, was given an immobilizer to wear, and was told to follow up with his physician. (Tr. 802).

### d. **Pinnacle Health- Physical Therapy**

From March 13, 2014 through September 15, 2014, Plaintiff attended physical therapy for left knee degenerative joint disease. (Tr. 825-897). Plaintiff reported he had left knee pain as soon as he began walking, but that he "pushed through the pain." (Tr. 825-897). Plaintiff also reported that his pain: was primarily a four (4) out of ten (10); was exacerbated by walking, standing, bending his knee, kneeling, and squatting; interfered with physical activity and sleep; and was of a constant achy, sharp, and stabbing nature. (Tr. 825-897). It was noted that Plaintiff reported no change in pain with treatment and had a mildly antalgic gait. (Tr. 825-897). At physical therapy, he performed strengthening exercises and received other therapy. (Tr. 825-897).

### 4. **Asthma**

### a. **Harrisburg Hospital**

On June 27, 2013, Plaintiff presented to the emergency room at Harrisburg Hospital due to complaints of shortness of breath, weakness, and fatigue. (Tr.

617). A physical examination revealed: rhonchi was present with unclear breath sounds; normal upper and lower extremity examinations; normal memory; normal affect; and orientation to time, person, and place. (Tr. 619). X-rays of Plaintiff's chest were negative. (Tr. 620). Plaintiff was diagnosed with bronchitis, was prescribed antibiotics, and was instructed to follow-up with his primary care physician. (Tr. 617, 620).

On May 25, 2014, Plaintiff visited the emergency room for asthma exacerbation with bilateral wheezing. (Tr. 741). Plaintiff underwent a chest x-ray for cough and dyspnea. (Tr. 688). The result was that the lungs were clear and the chest was normal. (Tr. 688). On physical examination, there was diffuse expiratory wheezing that resolved with continual treatment of albuterol, duonebs, and prednisone. (Tr. 741). Plaintiff was discharged the same day with a diagnosis of asthma exacerbation. (Tr. 741).

On May 27, 2014, Plaintiff again presented to the emergency room for shortness of breath, cough, and wheezing. (Tr. 742). Plaintiff had bilateral wheezing that improved with albuterol nebulizer treatments. (Tr. 742). Plaintiff was diagnosed with asthma exacerbation and discharged the same day. (Tr. 742).

On December 12, 2014, Plaintiff underwent an x-ray of her chest for chest pain. (Tr. 815). The results were that Plaintiff had no acute cardiopulmonary

process or significant abnormality in the chest. (Tr. 815).

On June 12, 2015, June 17, 2015 and June 20, 2015, Plaintiff presented to the hospital for asthma exacerbation, including shortness of breath and difficulty breathing. (Tr. 988-998). Examinations revealed diffuse expiratory wheezing. (Tr. 988-998). Plaintiff was prescribed steroids and an inhaler. (Tr. 988-998).

### B.    Medical Opinions

#### 1.    Sandra Banks, Ph.D.

On November 19, 2013, Dr. Banks performed a "Psychiatric Review Technique" for Plaintiff based on the medical records up to that date. (Tr. 71, 77). Dr. Banks opined that for Impairments Listings 12.04, Affective Disorders, and 12.06, Anxiety-Related Disorders, in terms of the "B" and "C" criteria, there was insufficient evidence to determine if these criteria were present. (Tr. 71, 77).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir.

2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2014. (Tr. 15). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his amended alleged onset date of June 8, 2013. (Tr. 15).

At step two, the ALJ determined that Plaintiff suffered from the following severe[8] combination of impairments: "Affective Disorder, Anxiety Related Disorder, Bilateratel Venous Insufficiency of the Lower Extremities, Obesity, and Asthma (20 C.F.R. 404.1520(c) and 416.920 (c); SSR 02-1p)." (Tr. 16).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926; SSR 02-1p). (Tr. 17-19).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 19-24). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] has the [RFC] to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasionally stand, walk, climb, balance, stoop, kneel, crouch, and crawl; frequently handle, finger, and feel bilaterally; no exposure to unprotected heights or temperature extremes; only occasional exposure to humidity, wetness, dust, fumes, or gases; can perform routine and repetitive one-to-two step tasks; can frequently interact with the public, coworkers, and supervisors; occasional decision making; and occasional changes in the work setting.

(Tr. 19).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the his age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 24-25).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the amended alleged onset date of June 8, 2013, and the date of the ALJ's decision. (Tr. 25-26).

**DISCUSSION**

On appeal, Plaintiff asserts that substantial evidence does not support the ALJ's decision because the ALJ erred: (1) in determining Plaintiff's spine disorder and left knee impairments were non-severe; (2) in determining the his RFC; and (3) in evaluating his credibility. (Doc. 11, pp. 14-27). Defendant disputes these contentions. (Doc. 13, pp. 11-16).

## 1.   RFC Determination

Plaintiff asserts, in part, that substantial evidence does not support the ALJ's RFC determination that Plaintiff could perform light work pursuant to Social Security Regulation ("SSR") 83-10, which defines light work. (Doc. 11, pp. 20-21).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect

judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. See 20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to SSR 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996 SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." Id. (emphasis added).

Regardless of what weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an

ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often [incorrect]." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination. Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011) (emphasis added). The administrative law judge cannot speculate as to a claimant's residual functional capacity, but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his or her determination. Doak, 790 F.2d at 29 ; See Snyder v. Colvin, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa. March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the

ALJ's ultimate determination. The ALJ's decision to discredit, at least partially, every opinion of every medical doctor's RFC assessment of Snyder left the ALJ without a single medical opinion to rely upon in reaching a RFC determination. 'Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS 84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); Wright v. Colvin, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.) ("Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical opinion evidence and there was no contrary treating source opinion. Id. '[D]ictum, unlike holding, does not have strength of a decision 'forged from actual experience by the hammer and anvil of litigation.' . . . the only precedential holding in Chandler is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. See Chandler, 667 F.3d at 361-63. . . . Consequently, with regard to lay reinterpretation of medical evidence, Frankenfield, Doak, Ferguson, Kent, Van Horn, Kelly, Rossi, Fowler and Gober

33

continue to bind District Courts in the Third Circuit."); Washburn v. Colvin, 2016

U.S. Dist. LEXIS 144453 (M.D. Pa. Oct. 19, 2016) (Conner, J.); Maellaro v.

Colvin, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014)

(Mariani, J.) ("The ALJ's decision to reject the opinions of Maellaro's treating

physicians created a further issue; the ALJ was forced to reach a residual

functional capacity determination without the benefit of any medical opinion.

Rarely can a decision be made regarding a claimant's residual functional capacity

without an assessment from a physician regarding the functional abilities of the

claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician

suggested that the activity [the claimant] could perform was consistent with the

definition of light work set forth in the regulations, and therefore the ALJ's

conclusion that he could is not supported by substantial evidence."). *See also*

*Arnold v. Colvin*, 3:12-CV-02417, 2014 U.S. Dist. LEXIS 31292, 2014 WL

940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v. Astrue*, 3:11-CV-02145, 2013

U.S. Dist. LEXIS 31765, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013);

*Troshak v. Astrue*, 4:11-CV-00872, 2012 U.S. Dist. LEXIS 137945, 2012 WL

4472024, at *7 (M.D. Pa. Sept. 26, 2012). The ALJ's decision to discredit, at least

partially, every residual functional capacity assessment proffered by medical

experts left her without a single medical opinion to rely upon. For example, three

physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk. Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (Doc. 10) (M.D. Pa. Feb. 15, 2012) (Conaboy, J.) ("Any argument from the Commissioner that his administrative law judges can set the residual function capacity in the absence of medical opinion or evidence must be rejected in light of Doak. Furthermore, any statement in Chandler which conflicts (or arguably conflicts) with Doak is *dicta* and must be disregarded. Government of Virgin Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011)(a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel). "); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39 (Doc. 14) (M.D. Pa. Jan. 31, 2012) (Munley, J.); Crayton v. Astrue, Civil No.

10-1265, slip op. at 38-39 (Doc. 17) (M.D. Pa. Sept. 27, 2011) (Caputo, J.).

In light of these precedential opinions, and upon review of the administrative record, it is determined that the decision of the Commissioner is not supported by substantial evidence because there was no opinion rendered regarding Plaintiff's physical limitations to be relied on by the ALJ in determining Plaintiff's RFC. This Court cannot ascertain from the analysis conducted by the ALJ how that decision-maker was able to determine a residual functional capacity in the absence of any medical opinion whatsoever regarding Plaintiff's limitations, particularly those regarding sitting, walking, and standing. Furthermore, the very definition of "light work" found in 20 C.F.R. § 416.967(b) makes it all the more important that this case be remanded, for this regulation is as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, <u>a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.</u> If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b) (emphasis added). The fact that the ALJ did not give

weight to any opinion involving walking, standing, or sitting, but rather seemingly reinterpreted the medical evidence in arriving at the RFC determination, goes to support the conclusion that the ALJ's RFC determination is not supported by substantial evidence.  See Snyder, 2017 U.S. Dist. LEXIS 41109 at *13-14 (Brann, J.) ("The ALJ failed to point to any specific medical evidence that would support a contrary opinion on Snyder's standing/walking capabilities, and as a result, it appears that the ALJ was forced to reach a RFC determination without the benefit of any medical opinion.  Accordingly, the ALJ's conclusion is not supported by substantial evidence.").  Therefore, because the ALJ's RFC determination that Plaintiff could perform light work is not supported by substantial evidence, pursuant to 42 U.S.C. § 405(g), remand is warranted, and this Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot.  Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, judgment will be entered in favor of Plaintiff and against Defendant, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: October 25, 2017

/s/ **William J. Nealon**
**United States District Judge**